**STATE, Plaintiff-Appellee v McLEAN, Defendant-Appellant.**

Ohio Appeals, 2nd District, Greene County.

No. 471.   Decided August 28, 1942.

Marcus Shoup, Pros. Atty., Xenia, for plaintiff-appellee.
Iddings, Jeffrey & Weisman, for defendant-appellant.

### OPINION

By GEIGER, PJ.

This matter is before this Court on an appeal on questions of law from a sentence by the Court of Common Pleas of the defendant-appellant who had been found guilty by a jury of manslaughter. This matter grew out of unfortunate incidents occurring in the village of Cedarville in Greene County.

As a pre-Fourth of July demonstration, a number of boys congregated on the street corners of the village and later in the evening rode about the streets of the village in pursuit of entertainment incident to throwing from their moving automobile fire crackers and cheap torpedoes. Defendant-appellant was indicted by the Grand Jury of the county, which presented that Hayes McLean, on the 3rd day of July, 1941. unlawfully killed Wallace Collins. The indictment was laid under §12404 GC, which provides "Whoever unlawfully kills another, except in the manner described in the next five preceding sections is guilty of manslaughter in the first degree

and shall be imprisoned in the penitentiary not less than one nor more than twenty years."

The pertinent definition of manslaughter is that if any person shall unlawfully kill another, unintentionally, while the slayer is in the commission of some unlawful act, such person shall be deemed guilty of manslaughter. The unlawful act under which the defendant was accused and upon which the verdict was based is §12422 GC, providing in substance that whoever intentionally and without malice points or aims a firearm at or toward a person or discharges a firearm so pointed or aimed shall be fined or imprisoned as provided in this section. The section further provides, "This section shall not extend to a case when fire arms are used in self defense or in the discharge of official duties or in the case of justifiable homicide."

The defendant was the town marshall of the village for many years. Early in the evening he was present in the center of the village where boys not only residents of the village but of the contiguous territory were congregated in anticipation of Fourth of July celebration. These boys, in groups and singly, purchased from available vendors cheap torpedoes and fire crackers, with which they were staging a preliminary to a real Fourth of July celebration. Numerous boys indulged in this procedure. The defendant, for several hours was present, observing the activities of the boys, but making no complaint, either as an officer or as a citizen. At about half past ten he got into his own automobile to drive to his home. It appeared that some boys, not residents of the village, had placed in the marshall's car a bomb which exploded when he started the car. The young men who afterwards constituted the immediate group who drove around the town prior to the fatal shooting, knew of the planting of this bomb and anticipated its explosion when the marshall sought to drive his car. Very shortly after the marshall left, a half dozen of the boys got into the car driven by the decedent, some being seated in the car and others riding on the running board. The car was driven about the town over hard surface streets, upon which torpedoes were thrown by the boys in the car and which exploded when coming in contact with hard surface streets, but did not explode when thrown on graveled streets or lots adjacent to the street.

During the course of the driving about the city, the decedent being at the wheel, the car twice within a period of five minutes passed the home of the defendant-appellant. When the boys first drove by the home they observed the defendant upon his porch and also took notice of the fact that the porch light and other lights in the house were burning so that the defendant might easily be discerned. Within five minutes they returned to the same point and observed that the lights had been turned off with the exception of one at the corner of the house. After they had driven by the house of the defendant they observed a sharp flash from a point near or behind a bush that was either on or adjacent to the defendant's

property. Immediately after this flash was seen the automobile in which they were riding swerved to the right, at first being accelerated and afterwards being stopped in the churchyard by one of the boys who rode in the front seat with the decedent. It was then discovered that the decedent had been struck in the back of the head, from which wound blood and brains were oozing. Immediately he was taken to the doctor's office, and died shortly thereafter. An autopsy was immediately held and it was discovered that a bullet, which had been broken into two fragments of unequal size had penetrated the back of the decedent's skull and a portion of the bullet had penetrated to the frontal bone of the skull. The automobile, which was a sedan, had a glass window which was partly down. Broken glass was found inside the automobile and the evidence fairly discloses that the bullet came diagonally through the sash and the partly lowered window, and that in doing so it was split into two and possibly three fragments.

Of course the little town was greatly excited and doctors were summoned and did all they could to save the boy's life, but he died in a few minutes. Among those who came to the doctor's office and afterwards was present at the autopsy was the defendant-appellant, who then made inquiries and statements which had the purpose of diverting from him any suspicion that might have attached to him as the perpetrator of the fatal shooting. Some of the boys riding in the car, in answer to his inquiries, stated, in substance, to him that they believed he fired the shot. He denied this. saying that he was home in bed. Afterwards he repeated this denial to numerous persons, officials and otherwise, during the course of which he reiterated the denial that he had no other pistol or firearm than that which was found in his bedroom and from which no discharge had been recently made. The next day upon the advent of state officers he consented to a paraffin examination of his right hand, the test being designed to show whether or not a revolver that may have been held in his right hand had been recently fired. The test was successful in disclosing the fact that according to the standard reaction he had fired a pistol from his right hand within a recent period, or at least had such chemicals on his hand as would produce the reaction sought, which was that the paraffin disclosed a deep blue or purple color.

On the Fourth he was further interrogated and taken to the jail in Xenia where, in the evening. he confessed that he had fired the shot from another revolver which he owned and which he had attempted to conceal by throwing it in the cistern. This revolver was recovered, being of 32-2/10 caliber, whereas the revolver which he officially used was a 32.

The case proceeded to trial. After the State had introduced its evidence the defendant moved for a directed verdict, which motion was by the Court overruled. The defendant then introduced his evidence which was almost exclusively that of character witnesses, the defendant himself not going upon the stand. The trial resulted in a conviction.

It is now before us upon claimed errors, which may be briefly enumerated:

(1) The Court erred in overruling defendant's motion to withdraw a juror and declare a mistrial for reasons that will be noted later.

(2) The Court erred in the admission of evidence.

(3) In overruling the motion of the defendant for directed verdict.

(4) In the charge to the jury.

(5) That the verdict is manifestly against the weight of the evidence and not sustained thereby.

(6) That the court erred in overruling the motion for a new trial.

(7) For other errors.

After the jury had been impaneled the Court instructed the Sheriff to conduct them to view the premises where the shooting occurred. Upon returning to the court room, counsel for the defendant-appellant asked that the record show that on the visit to the scene of the shooting under the order of the Court the jury were in the custody of the Sheriff under instructions to point out the various physical objects without comment, among them, a bush adjacent to the house of the defendant, and near where the defendant stood when the bullet was fired; that in directing the attention of the jury to this bush the Sheriff in substance said, "This is the bush, but it was larger then. It has been clipped." Counsel stated that in so stating the Sheriff gestured with his hand, indicating a greater height to the bush than then existed and by reason of this statement of the Sheriff the motion is made to withdraw a juror and to declare a mistrial. The Court overruled this and the case continued. We are not of the opinion that there was any prejudicial error in this matter. The bush in question did not prominently appear in the evidence, except that there was testimony to the effect that the flash which preceded the wounding of the decedent came from the direction of this bush. Counsel's argument is that the State was endeavoring to show that the defendant-appellant was lying in ambush behind the bush and that the statement was made by the Sheriff that the bush had been clipped so that as the jurors saw it it was not of sufficient height to conceal the body of a man. We do not know how any prejudice could flow from this matter, although counsel is apprehensive that the jury would infer that the bush had been clipped by the defendant for some purpose relating to his defense. The matter is especially nonprejudicial in that it was ultimately admitted the defendant fired the shot, and we can not say whether it made any difference whether he fired it from a point of concealment or from an unconcealed position, or his own porch.

In the case of **Jones v State, 51 Oh St 331,** the matter of the viewing of the premises by the jurors is discussed at large, and the incidents in that case were much more prejudicial than could have

been the statement of the Sheriff that the bush had been clipped. In the case cited a motion was made on behalf of the defendant for discharge of the jury on account of the proceedings there recited, and the court held that such motion was properly overruled. If we had no other reason we could rely upon this case as authority for sustaining the court in his refusal. This disposes of assignment No. 1.

As to assignment No. 2, no matter is definitely called to our attention which would indicate that the ruling of the court was prejudicial in the admission of evidence. The court was quite careful in excluding evidence wherever there seemed to be any doubt as to its admissibility. Counsel chiefly objects to the introduction of the piece of glass showing a jagged cut in the upper edge, for the reason that it had not been in the official custody for many days. Objection is also made that the doctors were permitted to refer to and read from notes in their possession while on the witness stand, which had not been prepared by them. As to the glass, we see no objection to the introduction of this evidence, as the jury could be advised as to the fact that it had not been in the official custody between the date of the showing and the date of the trial. The main purpose of the showing of the glass was to demonstrate that the bullet had come from a slanting position and that it had been cut in two or three pieces by going through the glass. This could not be prejudicial. As to the testimony by doctors from memoranda prepared by one and adopted by the others, we can not see that that is prejudicial inasmuch as they were only used to refresh the memory of the witness then testifying.

Assignment No. 2 overruled.

Assignment No. 3 will be overruled, and we will discuss it in connection with assignments Nos. 5 and 6, involving the weight of the evidence.

Assignment No. 4 relates to the charge of the court. Those matters to which objection is leveled may be exhibited in the following paragraphs of the charge, some of which are given in substance and some in detail. The court states that the unlawful act, if any, of which the defendant was guilty, in order to support the conviction of manslaughter, must be such as would reasonably be anticipated by an ordinarily prudent person as likely to result in the killing of another person, and that such unlawful act must be the proximate cause of the death. The court charged that the mere firing of a gun on one's own premises is not a violation of the law, but that the General Code makes it an offense against the law to intentionally and without malice point or aim a firearm at or toward a person or to discharge a firearm so pointed or aimed. The court charges that the term "toward a person" as used in the section making it an offense to intentionally point or aim a firearm means "in the direction of". The court charges that if the State has proved beyond a reasonable

doubt that the defendant McLean intentionally pointed a firearm at or in the direction of Wallace Collins, and that said McLean discharged said firearm while so pointed or aimed, by reason whereof the said Wallace Collins was killed, and that such firing was the proximate cause of the death, and that if the jury find that such act of the defendant would reasonably have been anticipated by an ordinarily prudent person as likely to result in the killing of another person, then you should find the defendant guilty of manslaughter. The court further charges the fact that the defendant McLean was a peace officer of the village of Cedarville did not give him any more right to shoot under the circumstances and the evidence than a private citizen would have had. An officer only has the right to take the life of another person in case of self defense or where he is attempting to apprehend some one on a felony charge, which is a penitentiary offense, and the person about to be apprehended attempts to escape. In that event the officer has a right to shoot the person in order to prevent his escape.

The most insistent complaint of the defendant of the alleged error of the court is that the court quoted to the jury only the first part of §12422 GC, and omitted that portion which provides that the section shall not extend to a case when firearms are used in self defense or in the discharge of official duty or in the case of justifiable homicide. It never was asserted by defendant and is not so claimed that there was any question of self defense or the discharge of official duty or justifiable homicide. The nearest matter could be a claim that in the discharge of his official duties the marshall might be justified in firing the shot in order to put an end to the unseemly demonstration which had extended all evening until practically midnight. However, it would not be urged by any one seriously that the marshall would have a right to shoot from a porch adjacent to the highway into an automobile full of boys in discharge of any supposed official duty. The marshall, while not testifying, has by reason of the recitation of his statement by other witnesses disclosed the fact that his intention was to shoot the tires, and that the accidental movement of the gun at the time of the discharge caused the bullet to be thrown upward to the level of the driver of the car. We would certainly have some doubt as to the ability of a man such as it appears the marshall to have been, to shoot with such accuracy as to have any hopes of piercing an automobile tire at a distance of at least 75 feet, in darkness, when the tires were on a moving automobile. We do not believe that his effort to quell the noise of the evening was "in the discharge" of official duties, or that it gave him license to discharge a firearm under the latter portion of the section. There was no evidence that required the giving of this charge and it was not error to neglect giving it.

The case of **Geiger v State of Ohio, 5 O. C. C. 283**, holds that

in an indictment founded on the first clause of §6822 GC, now §12422 GC, it is not necessary to aver that the firearm pointed was not being used in self defense or in the discharge of official duties or in case of justifiable homicide. If it was not necessary to recite the omissions in the indictment founded on the statute as held in the Geiger case, it certainly was not necessary for the court to make allusion to such omissions where there was no evidence disclosing that any of the omitted paragraphs are involved in the case at bar. We do not think there was any error in neglecting to charge the latter part of the statute and that counsel's statement, "under these circumstances the appellant was deprived of a fair and complete statement of the law determinative of his rights, and the facts relating thereto were removed from the consideration of the jury"', is not logical.

The remaining assignments of error relate to the weight of the evidence. One can not escape the fact that the officer acted hastily and thoughtlessly. He no doubt was provoked with the action of the boys in their driving past his place, throwing noisy torpedoes in close proximity to his house, and he no doubt was very incensed because some one placed a bomb in his automobile which was fired when he started home. But the net result is that he had a testy disposition and that he thought to quell the exuberances of youth by using harsh means. He should have known better and been better balanced, but we can not excuse his action for that reason.

His own action after the shot was fired until the evening of July 4th when he admitted that he had thrown his gun into the cistern indicates that in his own judgment there was no justification for his act. If he had been conscientiously of the opinion that he could take these matters into his own hands on account of his official position he would not have endeavored to conceal his connection with it by a constant flow of prevarication which continued until the tell-tale paraffin examination disclosed the fact that he had fired a gun with his right hand.

We might paraphrase the statement of Wanamaker, J., in the case of **Black v State, 103 Oh St 434,** at **page 442,** so as to apply to the defendant: "This officer of the law was engaged in an unlawful act, committing a breach of the peace, which peace it was his primal duty to preserve, from that breach of peace by him, an unlawful killing naturally and proximately resulted." This is abundantly sustained by the record and admits of no doubt. We commend the reading of this decision, as well as that of **Martin v State of Ohio, 70 Oh St 219,** which presents the other side of the picture as favorably as might be done, but still not so as to require the reversal of this case.

Judgment of the court below affirmed.

BARNES & HORNBECK, JJ., concur.