The State of Ohio, Appellee, *v.* Creech, Appellant.

(No. 209—Decided July 15, 1964.)

*Mr. Kenneth Koch,* prosecuting attorney, and *Mr. Robert Koch,* for appellee.

*Mr. S. S. Beard, Mr. Sumner J. Walters* and *Mr. James W. Childs,* for appellant.

*Per Curiam.* This is an appeal on questions of law by the defendant from a judgment of conviction and sentence pursuant to a verdict of guilty rendered by a three-judge court. The defendant, though not formally married to the decedent, had been living with him as his wife, and his death occurred as the result of the passage through his body from back to front of a single 22 caliber bullet fired from a sawed-off rifle in the control of the defendant and furnished by decedent to defendant for her protection. Except for the defendant there were no witnesses to the shooting, and all the evidence as to the defendant's purpose or intent to kill was circumstantial.

The defendant, appellant herein, has assigned error of the trial court in a number of particulars pertaining to the admission or exclusion of evidence and claiming that the judgment is against the weight of the evidence and not supported by sufficient evidence to prove the defendant guilty beyond a reasonable doubt. We have read the complete record in this case and have considered all the alleged errors. We find no error prejudicial to the defendant as to the admission or exclusion of evidence.

The serious question involved is the actual conviction of the accused of the crime of murder in the second degree. This offense is defined by Section 2901.05, Revised Code, and it is essential to a conviction thereunder that there be evidence beyond a reasonable doubt that the accused purposely killed another.

The applicable rule is set forth by the Supreme Court in the third paragraph of the syllabus in the case of *State* v. *Farmer,* 156 Ohio St. 214, wherein Judge Taft stated in his opinion, at page 222:

"If the use of a weapon, likely to produce death or serious bodily harm, results in death, such use, *in the absence of circumstances of explanation or mitigation,* may justify a determination beyond a reasonable doubt that there was an intent to kill. On the other hand, if the instrument so employed is one not likely to produce death or serious bodily harm, such determination will not be justified without some other evidence. See 26 American Jurisprudence 361, Section 305. In other words, though one may be presumed to intend results which are the natural, reasonable and probable consequences of his voluntary

act, such one may not be presumed to intend results which are not the natural, reasonable or probable consequences of such act. * * *'' (Emphasis added.)

See, also, *State* v. *Stallings,* 82 Ohio App. 337, and *State* v. *Beck,* 86 Ohio App. 144.

The burden of proof does not change and remains on the state to prove intent to kill beyond a reasonable doubt even when the accused contends and introduces ''evidence tending to prove, that the homicide was accidental. The legal effect of such evidence being, simply, to controvert an inference of an intent to kill, which may arise from the evidence introduced by the state.'' *Jones* v. *State,* 51 Ohio St. 331.

Here the state introduced evidence, and it was admitted by defendant, that the death of decedent was a result of a shot from a gun in the control of the defendant. The defendant in an interrogation by the prosecuting attorney on the afternoon following her arrest, while still contending that she mistook the decedent for a prowler, said:

''Q. All right now, you turned around and you saw somebody standing in the door? A. I just turned around, I heard a noise, I turned around, and pulled the trigger before I even looked.

'' * * *

''Q. You were standing about two feet right in front of the steps. Could you see it was a man? A. I didn't see nothing until after I pulled the trigger. Then I knew who it was and what it was. I wished it was me.

'' * * *

''Q. Well, you did kill somebody, didn't you? You pulled the trigger, according to your story, without even looking, didn't you? A. Yes.

''Q. Why did you do that? A. I was just scared.''

In her handwritten statement, thereafter executed by defendant the evening of the same day, she said:

'' * * * I then walked back to the house. On the way I saw Bob coming. I put Sissy in her bed and went outside to see what he was doing and where he's been. I knew the minute I'd walked up to him he'd been drinking. He told me not to start my * * * about him drinking. Then I went into the house and picked up the gun. I don't know how or when he got into the

door way. I don't know how I got outside with the gun. I turned around and pulled the trigger. I didn't aim to hit him. I just wanted to scare him. * * * ''

The following day the prosecutor again interrogated the defendant, and she said:

"Q. Well, now, not must have; what did you do? A. I don't know; I can't remember going in and getting the gun. The only thing I remember after we was talking was when he was in the doorway, and I turned around and I was going to shoot up above him to scare him.

"Q. That was your intent, was it? A. Yes, because I figured if I would scare him, he'd really quit drinking.

"Q. Why were you not facing, why were you turned away from him? A. I don't know.

"Q. And you say you turned around and shot. Did you aim before you shot? A. No.

"Q. Didn't aim any. What position did you have the gun in? Would you show me? A. I had it pointed up.
"    * * *

"Q. But your intention was to shoot over his head, is that what you are saying now? A. Yes. I didn't aim to shoot him, I just wanted to scare him.
"    * * *

"Q. And you turned around and fired without aiming? A. Yes.

"Q. Huh? A. Yes, but I had the gun pointed up; I wouldn't say straight up. I thought I had it pointed up far enough, I guess, not to hit him.

"Q. Where did you really expect to shoot the gun at? A. About towards the top of the door up above the door.
"    * * *

"Q. Did you want to get close to him? A. I didn't want to get close enough to hit him; I just wanted to scare him."

During trial the defendant testified:

"Q. And what did he do? A. Well, I asked him where he had been, why he had been a drinking. He told me not to start that * * * with him about his drinking, and he asked me why I was down to the neighbors.

"Q. And what did you tell him? A. I told him I went down there to see if I could find out where he was at, why he hadn't

come back, thought maybe he was in an accident or something. He said it was going to take more than neighbors to find out what happened to me. Then he started to urinate, and I went in the house to get the gun.

"Q. And prior to starting in the house to get the gun, had you touched him in any way, if you recall? A. Yes, I put my hands on his shoulders.

"Q. What was your reason for doing that? A. I was, figured if he knew I was there, he wouldn't do anything.

"Q. Then you went in the house and got the gun? A. Yes.

"Q. And you came outside? A. Yes.

"Q. Then what did Robert Grimes do? A. Well, after I was outside, he was starting in towards the house.

"Q. And did he say anything as he started toward the door? A. He called my name.

"Q. And what was the tone of the voice that he used in calling your name? A. Mean and angry.

"Q. What reason did you think that Robert Grimes was going into the house at that time? A. To look for me.

"Q. And what did you think he'd do to you if he found you? A. I figured he'd beat me after what he said about the neighbors.

"Q. And then now you are outside with the gun? A. Yes.

"Q. Then what did you do? A. I had the gun pointed up in the air. I figured if I would fire it, he'd see me with it, he wouldn't beat me, he'd leave me alone and go on in to bed.

"Q. What did you—A. (Interposing) Attempted—

"Q. —do then? A. I tried to fire the gun up in the air, and it wouldn't go off—(crying)—I figured since the gun didn't go off and I had it pointed up, it wasn't going to go off at all. I figured it jammed again, and when I lowered it, it went off again.

"Q. Now, when you attempted—I will wait a little bit— Now, when you started to lower the gun, what were you looking at, if you know? A. I was looking at the gun.

"Q. Were you paying any attention to where Robert was at that time? A. No.

"Q. At that time, did you have any intention of firing the gun? A. No, not when I was lowering, I figured it wouldn't go off.

"Q. It did go off in the process of lowering? A. Yes, it did.

"Q. Where was Robert Grimes when the gun went off? A. In the doorway.

"* * *

"Q. And now will you repeat once more just what you now recall as happened at that time? A. He started to urinate; I went in the house, picked up the gun and come back outside and had it pointed up in the air, and he was headed towards the house.

"Q. I'll ask you to state whether or not at that time, during those moments, you intended to point the gun at Robert Grimes? A. No, I did not.

"Q. At any time, did you have any intention of shooting him? A. No, I did not.

"* * *

"Q. Well, what is the truth? A. We had an argument at the side of the house.

"Q. Now, wait a minute, you had an argument? A. We had words. We did not have an argument.

"Q. Didn't you have an argument? A. We did not have an argument.

"Q. All right then, go on, please? A. After we had our words, I went into the house and got the gun—(crying). Went in the house and got the gun, thinking if he would see me with it and hear me fire it, he wouldn't hit me any more; he would just go in and go to bed.

"Q. Now, he hadn't hit you outside, had he? A. No, he had not, but he had threatened me in his own way.

"Q. He had threatened you out there? A. Yes, he did.

"Q. You were scared of him then? A. Yes, I was.

"Q. You went in the house and got the gun? A. Yes.

"Q. Because you were scared? A. No.

"Q. Why did you get the gun then? A. Because I thought if he'd see me with it, he wouldn't beat me up.

"Q. He never did see you with that gun, did he? A. No, I didn't give him a chance, I guess.

"Q. Because you shot him in the back, didn't you? A. Yes, accidentally, shot him in the back, yes.

"Q. I thought you told me on Sunday that you meant to shoot above his head? A. (Inaudible.)

"Q. What? A. I meant to fire the gun up in the air, yes, and it wouldn't go off.

"Q. Did you pull the trigger when you put the gun up in the air? A. I was trying to pull the trigger when the gun was in the air, yes.

"Q. You pulled the trigger? A. I tried. It wouldn't go off, so I lowered the gun figuring it wouldn't fire.

"Q. You have the gun up in the air. Did you pull the trigger? A. I was trying to pull the trigger.

"Q. Did you pull the trigger? A. I was pulling on the trigger but it wouldn't go off.

"Q. When you lowered the gun, did you then pull the trigger? A. I don't know.

"Q. Well, did it fire? A. Yes, it did.

"Q. Was your finger on the trigger? A. If the gun went off, my finger would have had to be on the trigger, yes.

"Q. And Bob was in front of you when you pulled the trigger, wasn't he? A. Yes, but I didn't know it.

"Q. Where were you looking? A. I was looking at the gun.

"Q. Why were you looking at the gun and not at Bob? A. Because I didn't know why the gun had gone off, and I was just looking at it as I lowered it."

All the defendant's other testimony during trial with relation to the firing of the gun was consistent with her testimony during trial, hereinbefore quoted.

It will be observed that, notwithstanding there are inconsistencies among the defendant's various statements and her own testimony during trial, she at all times denies the purposeful or intentional aiming of the gun at any human being and, while admitting that she, in fact, was holding the gun and apparently pulling the trigger, causing the decedent to be shot, she claims that, if aiming at all, she was aiming above the decedent intending to scare him, at no time consciously or intentionally aimed at him, and that his shooting was unintended and accidental. Any evidence to the contrary was entirely circumstantial.

This state of the evidence imposed upon the trial court, as well as this court, a fundamental rule of law set forth in paragraph six of the syllabus and stated in the opinion of Judge Bell in the case of *State* v. *Sheppard*, 165 Ohio St. 293, 300, as follows:

"The evidence in this case is largely circumstantial. In such a situation, it is conceded that the law of Ohio requires that the facts upon which a verdict of guilt is based must be established beyond a reasonable doubt. *The facts so established must be entirely irreconcilable with any claim or theory of innocence and admit of no other hypotheses than the guilt of the accused.* See *Carter* v. *State*, 4 Ohio App. 193; 15 Ohio Jurisprudence 2d 630, Section 462." (Emphasis added.)

See, also, *Atkinson* v. *State*, 8 Ohio Law Abs. 686; *City of Columbus* v. *Treadwell*, 46 Ohio Law Abs. 367; *City of Dayton* v. *Christ*, 31 Ohio Law Abs. 644; *Kosick* v. *Board of Liquor Control*, 74 Ohio Law Abs. 237; *City of Cleveland* v. *Coleman*, 72 Ohio law Abs. 94; and *City of Cleveland Heights* v. *Vaughn*, 93 Ohio Law Abs. 284.

On all the evidence before the trial court, and before us, there is a reasonable hypothesis of innocence of the crime of second degree murder in that the defendant, in accordance with her claim and her testimony, did not intend either to shoot or to kill the decedent, that although she aimed near to him or in his direction, she did not knowingly, purposely or intentionally aim *at* him, and his killing was therefore unintentional. It is our opinion, therefore, that there was not proof beyond a reasonable doubt of purpose or intention to kill and that the evidence is therefore insufficient to sustain the conviction from which this appeal is taken. For like reasons we are also of the opinion that the verdict and judgment of the trial court are also manifestly against the weight of the evidence. See *State* v. *Murphy*, 176 Ohio St. 385, and authorities therein cited.

However, as we view it, there was adequate evidence of an unlawful killing, in that defendant discharged a firearm in the direction of the decedent in violation of Section 3773.04, Revised Code (see *State* v. *McLean*, 38 Ohio Law Abs. 199), causing his death, and that the defendant is thus guilty, under Section 2901.-06, Revised Code, of manslaughter in the first degree.

Accordingly, we act in accordance with subparagraph (D)

of Section 2945.79, Revised Code, which subparagraph reads:

"(D) That the verdict is not sustained by sufficient evidence or is contrary to law; but if the evidence shows the defendant is not guilty of the degree of crime for which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict or finding accordingly, without granting or ordering a new trial, and pass sentence on such verdict or finding as modified, provided that this power extends to any court to which the cause may be taken on appeal * * *."

See *State* v. *Robinson,* 161 Ohio St. 213, and 162 Ohio St. 486; *State* v. *Porello,* 138 Ohio St. 239; and *State* v. *Clare,* 89 Ohio App. 286.

It is, therefore, the judgment of this court that the verdict and judgment of the Court of Common Pleas of Van Wert County be modified accordingly, without the granting or ordering of a new trial. It is ordered further that this cause be remanded to that court, under the provisions of Section 2953.07, Revised Code, with instructions to carry this order of modification into effect and impose the sentence as authorized by Section 2901.06, Revised Code, for a conviction of the crime of manslaughter in the first degree.

*Judgment accordingly.*

MIDDLETON, P. J., YOUNGER and GUERNSEY, JJ., concur.